# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. 1:20-CR-00029 |
| **Plaintiff,** | |
| -vs- | **JUDGE PAMELA A. BARKER** |
| **RONALD SHARP,** | **MEMORANDUM OPINION AND ORDER** |
| **Defendant** | |

Currently pending is Defendant Ronald Sharp's Motion to Suppress filed on November 9, 2020 ("Defendant's Motion"). (Doc. No. 26.) On November 16, 2020, the United States of America filed a Response in Opposition to Defendant's Motion ("the Government's Opposition"). (Doc. No. 27.) On January 22, 2021, a hearing on Defendant's Motion was held. At the conclusion of the hearing, the Court took the matter under advisement.

### FACTUAL BACKGROUND

The record, to include the exhibits attached to Defendant's Motion, the testimony of Officer Campbell Bailey adduced at the hearing, and/or exhibits introduced by the parties at the hearing demonstrate the following relevant facts.

On January 8, 2020, a one-count indictment was filed against Defendant Ronald Sharp ("Defendant") charging him with Felon in Possession of Firearm and Ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Doc. No. 1.) The charge involves a firearm and ammunition that were found under a pillow in Defendant's bedroom during a search of Defendant's residence conducted on October 4, 2019 by Ohio Adult Parole Authority officer Campbell Bailey ("Officer Bailey") and his team. This search, and the firearm and ammunition,

as well as any evidence of criminal conduct contained in two computers and cell phone also located inside Defendant's home and seized by Officer Bailey and his team, are the subject of Defendant's Motion.

The parties agree that Defendant was convicted of Gross Sexual Imposition and Kidnapping in the Court of Common Pleas, Cuyahoga County, Case No. CR-03-445796, and sentenced to 12 years of imprisonment and 5 years of post-release control. (Doc. No. 26, PageID # 92; Doc. No 27, PageID # 116.) They also agree that on December 23, 2015, Defendant was released from state prison and his five years of supervision by the Ohio Adult Parole Authority ("APA") began. (*Id.*) Officer Bailey began supervising Defendant in 2018, and although a risk assessment would have been completed, a case plan with goals and objectives would have been generated, and general and special conditions of supervision and residence information would have been reviewed at the time the APA began supervising Defendant in December 2015, Officer Bailey did these thing again when he began supervising Defendant in 2018.

Officer Bailey confirmed that Exhibit 1 the Government introduced at the hearing is a true and accurate copy of Defendant's Conditions of Supervision that was signed by Defendant on 11/7/17. At the time Officer Bailey began supervising Defendant, Officer Bailey made Defendant aware of his conditions of supervision again. There are eight standard conditions of supervision that every offender under supervision with the ADA is bound by, including Defendant. The handwritten conditions in a box below the eighth standard condition[1] are special conditions unique to an offender, and there were two special conditions applicable to Defendant: sex offender

---

[1] The Eighth General Condition reads: "I agree to fully participate in, and comply with, Special Conditions that will include programming/intervention to address high and moderate domains if indicated by a validated risk tool selected by DRCC and any other special conditions imposed by the Parole Board, Court, or Interstate Compact:"

screening and programming if indicated; and no unsupervised contact with minors (supervising adult must be approved by APA).

Two of the eight standard conditions of supervision Defendant was bound by and that he was made aware of, provide in relevant part as follows:

>   1. I will obey federal, state and local laws and ordinances including those related to illegal drug use and registration with authorities. ***
>
>   ***
>
>   7. I agree to the warrantless search of my person, motor vehicle, place of residence, personal property, or property that I have been given permission to use, by my supervising officer or other authorized personnel of the Ohio Department of Rehabilitation and Correction at any time.

In early 2018, before Officer Bailey assumed supervision of him, Defendant was arrested by his then-APA officer for an allegation of domestic violence and possession of a firearm, which were violations of standard conditions 1 and 4.[2] (*See* Doc. No. 26-1, PageID #104-105.) Defendant was found guilty of a violation of Rule 4 and sentenced to a prison sanction of 192 days by the Ohio Parole Board, released from that sanction, and restored to supervision. (Doc. No. 26-1.) While under supervision by Officer Bailey, Defendant committed a violation of his special condition of no unsupervised contact with minors (supervising adult must be approved by APA), and was reprimanded in writing and verbally before a parole board hearing officer.

On September 25, 2019, Officer Bailey received a telephone call from Detective Torres of the Cleveland Police Department notifying him that Defendant was a named suspect in a rape

---

[2] Standard condition number 4 reads in relevant part as follows: "I will not purchase, possess, own, use or have under my control, any firearms, ammunition, dangerous ordnance, devices used to immobilize or deadly weapons….. I will obtain written permission from the Adult Parole Authority prior to residing in a residence where these items are securely located." (The Government's Exhibit 1.)

which had allegedly occurred on September 14, 2019, and Detective Torres provided Officer Bailey with the initial police report filed by the alleged rape victim. From his discussion with Detective Torres and review of the police report, Officer Bailey learned that Defendant's adult female cousin was at his residence on September 14, 2019 with her two minor children, and after drinking alcohol supplied by Defendant, the alleged rape victim became dizzy and lightheaded and could not move. According to the alleged victim, Defendant carried her to his bedroom where he raped her.

Upon learning this information and given Defendant's status as a registered sex offender on parole, Officer Bailey contacted his supervisor, they had Defendant declared a parole violator, and a nationwide arrest warrant was issued for Defendant. Subsequently, Officer Bailey began conducting his own investigation, and as part of that investigation, he reviewed the taped-on-camera verbal statements that the alleged victim and her minor daughter had given to Detective Torres on September 27, 2019. Officer Bailey did not conduct a separate interview of the alleged rape victim and her daughter so as not to re-traumatize them, given the nature of the case, i.e., sexual assault.

Officer Bailey's investigation revealed to him that there were minor children at Defendant's residence at the time of the alleged sexual assault, in Defendant's presence without permission and possibly unsupervised as well. So, Officer Bailey made plans to arrest Defendant at his home on October 4, 2019. However, on the morning of October 4, 2019, Defendant contacted Officer Bailey to advise that he was working and not at home, gave him the worksite address, and then Officer Bailey and his team headed there and placed Defendant in custody.

After Defendant was taken into custody, Officer Bailey inquired of him where his personal property was, like his phone and house keys, and Defendant said they were in his work truck, and

these items were retrieved. Then, Defendant was transported to his registered address/paroled home, and after accessing the home with the house keys, officers conducted a security sweep of the residence, just looking for a body in the home. After the security sweep was completed, Officer Bailey and officers went inside the home, and conducted a parole search of the home.

Officer Bailey testified that prior to arresting Defendant, he did intend to conduct a search of Defendant's residence. According to Officer Bailey, the "primary reason" they conducted a search of Defendant's home was because of the allegations made in the police report and the verbal statements taken from the alleged rape victim and her minor daughter, that there were children in his registered address/paroled home.[3] The "main reason" for searching the home, per Officer Bailey, was to make sure children were not there and to collect any additional evidence to support the argument that Defendant was in violation of his special condition of supervision that he have no unsupervised contact with minors and supervising adults must be approved by the APA.[4] As was his common practice in searching an offender's home, Officer Bailey went straight to the bedroom because in his experience that is where most people keep their close personal property, items of special interest. Typically, Officer Bailey has found children's clothing, kids' toys in the bedroom, and one could find children's toothbrushes, cups, diapers, and things like that.

Officer Bailey found a firearm underneath Defendant's pillow. The firearm was secured and collected, as was the ammunition in it, and "as evidence" officers took two computers, an additional cell phone, body armor and a bulletproof vest that they located in the home.[5]

Officer Bailey drafted a report after the search of Defendant's home, introduced by the Government as Exhibit 2 during the hearing. Officer Bailey testified that the Government's

---

[3] Tr., p. 31, lines 21-25, p. 32, lines 1-7.
[4] Tr., p. 32, lines 24-25, p. 33, lines 1-2.
[5] Tr., p. 33, line 9.

Exhibit 2 is a true and accurate copy of the report he completed after the search of Defendant's residence. Officer Bailey testified that he included the second full sentence of the Report[6] because the alleged rape was one of the reasons that he had searched Defendant's residence, although he also testified that "there really wasn't anything that [he] could search for or that [he] thought [he] could find in the residence to support the rape allegation since the victim had provided her statement already to police."[7] Officer Bailey testified that he included the third full sentence of the Report,[8] not because it was a reason he searched Defendant's residence on October 4, 2019, but because he had knowledge of Defendant's "bad behavior" on supervision, and to highlight that Defendant could possibly be in possession of a gun during the arrest, a safety risk to the community.[9] Officer Bailey testified that it is part of his training and experience to consider a parolee's prior conduct when conducting a search of his or her residence. Officer Bailey testified that the fourth sentence of the Report[10] referred to the alleged adult rape victim and her minor daughter corroborating that there had been children in Defendant's home, which was "primarily why a search of the residence was warranted."

---

[6] The second full sentence of the Report reads: "The offender was a named suspect in a rape which had allegedly occurred at the offender's residence on 09-14-19." Government's Exhibit 2. Defendant's Exhibit C-1 attached to Defendant's Motion to Suppress. (Doc. No 26-3, PageID # 113.)

[7] Tr., p. 32, lines 13-23.

[8] The third full sentence of the Report reads: "Furthermore, it was planned to conduct a search of the offender's residence as he had been arrested before for a parole violation on 02-28-18 after he was found in possession of a Tech 9 submachine gun along with twenty-four (24) live rounds of ammunition." Government's Exhibit 2 Defendant's Exhibit C-1 attached to Defendant's Motion to Suppress. (Doc. No. 26-3, PageID # 113.)

[9] The Court notes that Officer Bailey testified that he completed the Report after he had arrested Defendant at his place of work and Defendant was in custody at the time Officer Bailey and his team completed the search of Defendant's residence. Arguably, then, Officer Bailey would have known at the time he completed the Report, that Defendant did not have a gun during his arrest, and therefore, would not have been a safety risk to the community immediately before and during the search. However, Officer Bailey also testified that he included the third full sentence as evidence of his knowledge of Defendant's "bad behavior" while on supervision.

[10] The fourth full sentence of the Report reads: "Lastly, a search of the offender's residence was warranted as there were recent allegations of him having contact with minor children in the home (the offender is a registered Sexual Predator and is restricted from having unsupervised, unapproved contact with minor children). Government's Exhibit 2, Defendant's Exhibit C-1 attached to Defendants' Motion to Suppress. (Doc. No. 26-3, PageID # 113.)

Upon cross-examination, Officer Bailey testified that he was aware that the standard associated with searches is reasonable suspicion and had had training as to what would or would not constitute reasonable suspicion. As to the January 30, 2018 incident involving the domestic violence allegation and a firearm being located as a result of a search associated therewith, Officer Bailey testified that although he was not Defendant's parole officer at the time, he knew that the firearm was located in a vehicle outside of Defendant's home. Defendant's counsel had Officer Bailey review a note dated 3/27/2018 completed by Defendant's prior APA officer, included in Defendant's file that Officer Bailey had access to, documenting that the victim of the alleged domestic violence had advised the prior APA officer that she had placed the bag that contained the firearm in the vehicle where it was located. (Defendant's Exhibit D.) Subsequently, Officer Bailey spoke with a person who identified himself as Jeffrey Wright over the phone who claimed the weapon found during the search associated with the January 30, 2018 incident was his; and Officer Bailey had an appointment to meet with him, but he never answered the door and has never followed up with Officer Bailey. Regardless, Officer Bailey acknowledged that during his supervision of Defendant there was never any reason that he had to believe or make him suspicious that Defendant had firearms in his residence. However, as developed upon re-direct, the firearm found in February of 2018 was not the same one found during the search of Defendant's home on October 4, 2019; they were two different types of firearms.

Officer Bailey also acknowledged that with respect to Defendant's violation in January of 2019 involving an allegation of unsupervised contact with a minor, it was determined that when the Defendant's minor grandchildren were in Defendant's home, their parents were with them, but there was no allegation or any indication that Defendant had had sexual contact with a minor. However, as developed upon re-direct, it was still a violation of Defendant's supervision to be in

the presence of minors, or per Special Condition 8 – without the supervision approved by the APA – regardless of what that contact entailed.

Officer Bailey confirmed that within the police report(s) that he reviewed, he saw a statement from the alleged rape victim that Defendant had been helping her with transportation for approximately 10 days prior to the date she had made the police report, and that upon Defendant's arrest, Defendant had admitted to Officer Bailey that he had been helping the alleged victim and her children with transportation; Defendant did not deny that he had spent time with the alleged victim's children. Officer Bailey did not tell Defendant that he was coming out to arrest him. When asked to review a report completed by Task Force Officer Curley, attached to Defendant's Motion as Exhibit B-1, and while acknowledging that that report included a statement set forth in paragraph 3,[11] Officer Bailey testified that the 2-28-18 previous parole violation and the finding of the firearm after a search associated therewith, had no bearing on the primary reason that he was searching Defendant's residence.

Upon re-direct, Officer Bailey testified that despite the lapse of time between the rape allegation made on September 24, 2019, and the search of Defendant's home on October 4, 2019, there was reasonable suspicion to believe that violations of Rule 1 and Rule 8 had been committed by Defendant, based upon the initial police report, the complaint made by the alleged victim, and subsequent verbal statements made by the alleged victim and her minor daughter. While confirming that between the September 14, 2019 date of the alleged rape, and his search of Defendant's home on October 4, 2019, the state had not issued a state arrest warrant, Officer Bailey testified that what a detective does or does not do has no bearing on his investigation; the

---

[11] The statement at issue reads: "Further inspection of the home was warranted due to a previous parole violation on 2/28/18 where he was found to be in possession of a Tech 9 submachine gun and twenty-four (24) rounds of ammunition." (Defendant's Motion, Exhibit B-1, PageID # 107.)

investigations are separate, and Officer Bailey makes his own determination to search a parolee's home to prove violations of conditions of supervision. Officer Bailey confirmed that pursuant to General Condition 7 that applies to every parolee, Defendant had agreed to the warrantless search of his place of residence. Officer Bailey reiterated, upon re-direct, that he considers multiple different things when he is searching a parolee's residence, but in the instant case, the primary reason that he searched Defendant's residence on October 4, 2019, and the reasonable suspicion for the search was to find evidence of "unsupervised contact with minors, minors in the home without permission."

## **ARGUMENT AND ANALYSIS**

The Government, Defendant, and this Court agree that there are two distinct analytical approaches under which a court may uphold a warrantless probation or parole search, set forth in *United States v. Knights*, 534 U.S. 112 (2001), and *Griffin v. Wisconsin*, 483 U.S. 808 (1987). (The Government's Opposition, Doc. No. 27, PageID # 118-119; Tr., p. 65, ls. 12-25, p. 66, ls. 1-25, p. 67, 1-18, Tr., p. 68, l. 25, p. 69, ls. 1-4.) Under the *Knights* analysis, the court must engage in a totality of the circumstances inquiry to determine whether a warrantless search of a probationer or parolee's residence was reasonable under the Fourth Amendment. *See Knights*, 534 at 119-21; *Samson v. California*, 547 U.S. 843 (2006); and *United States v. Tessier*, 814 F.3d 432 (6th Cir. 2016).

Reasonableness "'is determined by assessing on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Samson,* 547 U.S. 843, quoting *Knights*, 534 U.S. 112, 118-119. In *Samson*, the Court explained its approach in *Knights*, as follows:

> Applying this approach in *Knights*, the Court found reasonable the warrantless condition authorized by California law. In evaluating the degree of intrusion into

> Knights' privacy, the Court found his probationary status 'salient,' *id.*, at 118, 122 S.Ct. 587, observing that probation is on a continuum of possible punishments and that probationers 'do not enjoy 'the absolute liberty'" of other citizens, *id.*, at 119, 122 S.Ct. 587.  It also found probation searches necessary to promote legitimate governmental interests of integrating probationers back into the community, combating recidivism, and protecting potential victim.  Balancing those interests, the intrusion was reasonable.  However, because the search was predicated on both the probation search condition and reasonable suspicion, the Court did not address the reasonableness of a search solely predicated upon the probation condition. Pp. 2197-2198.

*Samson*, 547 U.S. 843.

And as applied to the warrantless search of a parolee's person, the Court in *Samson* found that because parolees are on the "continuum of state-imposed punishments, [they] have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is." *Samson*, *id*.  According to the Court, "[a] State has an "'overwhelming interest'" in supervising parolees because they "'are more likely to commit future criminal offenses[,]'" and "[s]imilarly, a State's interests in reducing recidivism, thereby promoting reintegration and positive citizenship among probationers and parolees, warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Samson*, *id.* at 844.

In *United States v. Loney*, 331 F.3d 516 (6th Cir. 2003), the Sixth Circuit articulated the "special needs" approach established in *Griffin* and its progeny, as follows:

> In analyzing a special needs search of a parolee under *Griffin* and its progeny, courts conduct a two-pronged inquiry. First, courts examine whether the relevant regulation or statute pursuant to which the search was conducted satisfies the Fourth Amendment's reasonableness requirement. *See Payne,* 181 F.3d at 786–91; *United States v. Conway,* 122 F.3d 841, 842–43 (9th Cir.1997). If so, courts then analyze whether the facts of the search itself satisfy the regulation or statute at issue. *Payne,* 181 F.3d at 786–91. With respect to the first prong of the *Griffin* analysis, it is now beyond question that a state statute survives Fourth Amendment scrutiny if it authorizes searches of parolees based on a reasonable suspicion that an individual is violating the terms or conditions of parole. *Id.* at 786. As for the second prong, the reasonable suspicion standard is less stringent than the probable cause requirement. Nonetheless, it still requires that, given the totality of the circumstances, parole officers provide "'articulable reasons' and 'a [is there

> more to the quote here?] 788 (quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

*Loney*, *id.* at 520-521.

In *Loney*, the Sixth Circuit found that O.R.C. Section 2967.131(C) passes constitutional muster.[12] That statutory provision reads in relevant part as follows:

> ***[A]uthorized field officers … engaged within the scope of their supervisory duties or responsibilities may search with or without a warrant, … real property in which the individual or felon … has the express or implied permission of a person with a right, title, or interest to use, occupy, or possess, if the field officers have reasonable grounds to believe that the individual or felon … is not abiding by the law or otherwise is not complying with the terms and conditions of [supervision].

Accordingly, as was true in *Loney*, the validity of the special needs search in the instant case turns on the second prong of the *Griffin* analysis: namely, whether Officer Bailey had reasonable grounds to suspect that Defendant was violating the terms and conditions of his parole.

The Government asserts that the search of Defendant's residence passes both the *Knights* analysis or approach and the *Griffin* analysis or approach, i.e., having signed the Conditions of Supervision, to include Condition No. 7 agreeing to the warrantless search of his home, and given the State's interest in having Defendant re-integrate back into society and reduce recidivism, the valid governmental purposes of the search outweighs Defendant's privacy interest; and the evidence demonstrates that Officer Bailey had reasonable suspicion to search Defendant's home, given his criminal history and to build his case that Defendant was having non-approved contact with minors, and a possible violation of state law.

In Defendant's Motion, Defendant set forth and discussed the "special needs" approach set forth in *Griffin*, and asserted that the parole violation on 2-28-18 which prompted a search and the finding of a firearm, and the parole violation in January of 2019 when Defendant's grandchildren

---

[12] Defendant agrees with this conclusion. (Defendant's Motion, Doc. No. 26, PageID # 94.)

were in his home, do not support a reasonable suspicion that Defendant was in violation of his parole supervision on October 4, 2019 when Officer Bailey and his team conducted a search of Defendant's residence and found a firearm, ammunition, two computers, cell phone, and other items. However, at the conclusion of the hearing on Defendant's Motion, Defendant's counsel acknowledged that Officer Bailey had testified during the hearing that he conducted the search on October 4, 2019 to find evidence of contact with minor children. Defendant argues that because there was no additional evidence of contact with minor children found at the home, and because the search was conducted on October 4, 2019, or three weeks after the September 14, 2019 date of the alleged rape, Officer Bailey could not have had reasonable suspicion that there would still be evidence of contact with minor children in the home.

Defense counsel's only reference to an evaluation of the evidence and Defendant's Motion under the *Knights* approach was to say "I think under *Knights*, the Court does need to balance the purpose of the search and the privacy interest of Mr. Sharp[;] [a]nd I do agree that as a parolee, his rights as far as having his residence searched are not the same as you and I who aren't on parole[;] but there still has to be some reasonable suspicion, and the search has to be related in scope and justified by the circumstance[;] and in this case we submit it was not."[13]

The Court finds that under the "totality of the circumstances" test or approach set forth in *Knights* (in the context of a probationer) and *Samson* (in the context of a parolee), the search of Defendant's residence was reasonable. First, Defendant, as a parolee (who, according to the United States Supreme Court has less of an expectation of privacy than a probationer), agreed to a search condition that he would submit his place of residence to a search and was informed of it, and therefore, Defendant's reasonable expectation of privacy was significantly diminished.

---

[13] Tr., p. 74, lines 24-25, p 75, lines 108.

Second, the State of Ohio has an overwhelming interesting in supervising parolees to reduce recidivism, and to promote reintegration and positive citizenship among parolees. Additionally, Defendant's criminal history, and specifically his previous violation of having contact with minor children absent approval from the APA, and Officer Bailey's stated and justified purpose in searching the home to find evidence or build his case of contact with minor children as reported by the alleged rape victim and her minor daughter demonstrate the reasonableness of the search.[14] Defendant's argument that because Officer Bailey did not find any such evidence during the search, he could not have had reasonable suspicion to conduct the search, puts the cart before the horse. Officer Bailey could not know what he would or would not find until he searched Defendant's home.

As to Defendant's argument that Officer Bailey could not expect to find any evidence of contact with minor children because three weeks (actually, 19 days) had lapsed between the alleged contact and the date of the search, the Court is not persuaded. Officer Bailey was aware that the convictions for which Defendant had served 12 years in prison prior to being placed on 5 years of post-release control were for the kidnapping and gross sexual imposition of two minor victims. It is reasonable to believe that Defendant might have kept personal belongings of the minor children who were alleged to be in his home on September 14, 2019. Moreover, Officer Bailey did not learn of Defendant's alleged violation of having minors in his home until he received a call from Detective Torres on September 24, 2019. Then, after reviewing the statements of the alleged rape victim and her minor daughter on September 25, 2019, Officer Bailey secured the arrest warrant. Before arresting Defendant and searching his home, Officer Bailey was planning to do just that,

---

[14] Because Officer Bailey testified that he did not expect to find any evidence of the alleged rape during the search of Defendant's residence, the Government's argument that an alleged violation of Condition 1 should also be considered in evaluating whether Officer Bailey had reasonable suspicion to search the home is rejected and not considered.

and he did so exactly 9 days later, not a long or significant lapse in time. Indeed, according to Officer Bailey, Defendant did not know that he was going to be arrested or his home searched when he arrived at Defendant's place of employment on October 4, 2019. So, arguably, Defendant would not have had reason to remove any items that might further implicate him in the violation of having minor children in his home without approval. And, although Officer Bailey confirmed that the alleged rape victim had reported that Defendant had been helping her and her children with transportation for the 10-day period prior to the alleged rape and contact with minor children, and Defendant did not dispute this allegation when Officer Bailey confronted him with that allegation, these facts do not obviate Officer Bailey's stated main or primary purpose in conducting the search, i.e., seeing if minor children were in the home and looking for evidence to further support unapproved contact with minor children on September 14, 2019. This, coupled with Officer Bailey's knowledge of Defendant's prior "bad behavior" provided the reasonable suspicion necessary under the *Griffin* approach as well.

While the Sixth Circuit has explained that "a parolee's 'criminal record alone does not justify a search of his or her home,'" it may be taken into account with other factors in determining whether a reasonable suspicion existed for the search of a parolee's home. *See Loney*, *id.* at 522, quoting *United States v. Payne*, 181 F.3d 781, 790-91, (6th Cir.1999). *See*, *also*, *United States v. Lee*, 2014 WL 2619685 (N.D. Ohio 2014 (recognizing that the totality of the circumstances approach precludes the Court from considering each attendant circumstance "in a vacuum." (*Id.* at \*6.)

Accordingly, Defendant's Motion is DENIED.

**IT IS SO ORDERED.**

                                          _s/Pamela A. Barker_
                                          PAMELA A. BARKER
Date: February 1, 2021                 U. S. DISTRICT JUDGE